## AMMON UNDERWOOD v. MAGGIE L. COOLGROVE.

### (Case No. 1326.)

1. LIMITATION.— When the plea of limitation was interposed against a claim for the value of personal property intrusted to defendant, and converted by him, and there was evidence tending to sustain the plea, it was error to refuse a charge to the effect that, if defendant used no fraudulent means to conceal the conversion, and plaintiff might, by the use of ordinary diligence, have discovered such conversion, then limitation began to run against plaintiff as soon as she, by the use of ordinary diligence, might have discovered such conversion; and the right to recover was limited to two years from the time when such discovery might have been made.

2. CHARGE OF COURT.— See opinion for a charge of court in regard to the liability of an attorney, held erroneous, when considered with reference to the testimony of the attorney, and, perhaps, as calculated to mislead the jury.

3. PRACTICE.— A question raised by an assignment of error, involving the ruling of the court in excluding evidence, cannot be considered when the bill of exception fails to show the objection to the evidence.

APPEAL from Brazoria. Tried below before the Hon. Wm. H. Burkhart.

Suit brought on the 19th of April, 1879, by appellee against Ammon Underwood and the firm of Mitchell, Calder & Davidson, composed of John C. Mitchell, Robert J. Calder and Wm. L. Davidson, defendants below, for the recovery of one hundred and twenty-nine bonds, or the value thereof, issued by the county of Brazoria, payable to bearer, with coupons attached, in aid of the H., T. & B. Railway Co., which, the plaintiff alleged, belonged to her and was unlawfully withheld from her by the defendants. The cause was tried by a jury at the spring term, 1880, of the court, and resulted in a verdict and judgment for the plaintiff.

The appellee alleged that one U. C. Coolgrove became the owner of one hundred and twenty-nine of the bonds with coupons attached; that Coolgrove afterwards left the bonds with the appellant for safe keeping; that thereafter said Coolgrove, for value, transferred and delivered the bonds and coupons to the appellee; that about March 1, 1878, the county commissioners' court of Brazoria county effected a decree of compromise in respect of all the bonds, whereby the holders thereof were to surrender them and take in place thereof new bonds for the principal, which new bonds were accordingly issued by the county March 1, 1878, payable to bearer in twenty-five years; that the old one hundred and twenty-nine bonds came within the terms of the compromise decree, and that appellant surrendered them and took in place thereof the new bonds with coupons attached thereto, the principal whereof amounted to $12,900, which was their

value, and the attached coupons were worth either $8 or $40 — as the same may be attached to $100 or $500 bonds,— the numbers whereof were unknown to plaintiff.

That the appellant, after getting possession of said new bonds, refused, though often requested, to deliver them to the appellee; that thereupon she employed the law firm of Mitchell, Calder & Davidson to recover the same for her for a fee of ten per cent. That by a fraudulent combination between said law firm and appellant they made some sort of division of said new bonds unknown to her, without her authority or consent, and in disregard of her rights. That said new bonds and attached coupons were still her propetry, and that Underwood and Mitchell, Calder & Davidson refused to deliver them, though often requested so to do, to her damage $15,000, and she prayed judgment against them for the new bonds and coupons, or for their value, and for general relief.

Mitchell, Calder & Davidson answered May 20, 1879, by general denial, and specially that they were never employed by the appellee and had no knowledge of appellee's interest in the bonds, but were employed by her father, U. C. Coolgrove, to recover the bonds, which he claimed, for a fee of one-half of what might be recovered, either by suit or compromise, which they were authorized to make; that in good faith they compromised the claim with Underwood, receiving $4,500 in new bonds, although they had been instructed to take a less amount in settlement and compromise of the claim, and of which they paid over to U. C. Coolgrove $2,300, retaining the balance as their fee.

A. Underwood denied that the appellee ever was the owner of the bonds sued for, or was ever in possession thereof or entitled to the possession; that in 1859, U. C. Coolgrove, father of appellee, in order to procure advances from appellant to enable said Coolgrove to carry on his plantation and perform certain contracts he had made with the railway company, authorized him to receive from the H., T. & B. Railway Co. all bonds that the company might be owing to him on completion of his contracts with them, and to hold the same as collateral security for the advances; that in pursuance to this agreement appellant obtained from the company one hundred and twenty-eight Brazoria county bonds and some detached coupons; that thereafter, on settlement with U. C. Coolgrove, he owed appellant $812.55, for which he gave his note on 20th August, 1866; that thereafter, on 15th of July, 1867, U. C. Coolgrove transferred and conveyed said bonds to defendant as collateral to secure said note; that on the 20th of August, 1867, appellant being indebted to Mrs.

C. J. Borden, transferred the said (Coolgrove) note and bonds attached thereto in part payment of his debt to her; that neither the appellant nor Mrs. B. ever had any notice of any claim or right set up or claimed by appellee to the bonds; that from the 20th of August, 1867, the note and bonds had been the property of the estate of Mrs. Borden, and that since that time he had not owned or held the bonds, except as the agent of Mrs. C. J. Borden, or as her executor; that on the 3d May, 1878, U. C. Coolgrove brought a suit, No. 3663, in district court of Brazoria county, in his own name, to recover the bonds, of which the appellee well knew, but neither intervened therein or gave any notice of any interest claimed thereby to the appellant; that the suit was compromised by the attorneys, duly authorized, of which she knew, and he pleaded the fact as an estoppel; that he paid over to M., C. & D., who were then the authorized attorneys and in possession of the receipt of appellant, given to U. C. C. originally for the said old bonds, and that they entered "satisfaction" thereon and delivered same to appellant; that the attorneys had authority to make the settlement and pleaded the same in bar. He also pleaded the statute of limitations in bar.

On the 28th of May, 1880, A. Underwood, as executor of the estate of Mrs. C. J. Borden, filed petition of intervention in his representative capacity, in which it is alleged that in August, 1867, he sold, for value, to Mrs. Borden, the note of U. C. Coolgrove, and the bonds were given to secure same; that she died in July, 1875, and that this defendant was executor of her last will, and that said note and bonds were the property of her said estate by virtue of the sale thereof, etc.

The appellee moved to strike out the intervention because it introduced new parties and new matters, and sought to make new issues of facts which ought to have been done before, if at all, and that the transaction set up between them was irrelevant to this suit. The original answer of the appellant, filed May 22, 1879, denied his liability to any one except to Mrs. C. J. Borden, of whose will he was executor, and to whose estate the bonds belonged by sale, for valuable consideration, to her by appellant, made in 1868; that she held said bonds as her property till her death in 1875; that he was executor of her will, and in that capacity a necessary party, and asked that he be made such.

The court granted the leave to A. Underwood, as executor of the will of Mrs. C. J. Borden, to intervene for the protection of the rights of her estate, but sustained the motion to strike out the intervention.

It was proved that the old bonds were held by the appellant in accordance with the following writings, contemporaneously executed:

"I, by these presents, do transfer and assign to A. Underwood all my right, title and interest in and to one hundred and twenty-eight bonds of $100 each, and seventy-five coupons of $8 each, detached from Brazoria county bonds, said bonds being the same that was placed in the hands of A. Underwood by me, as collateral security, in 1860, and for all of which bonds I have received payment in full.

(Signed)                    "U. C. COOLGROVE.

"COLUMBIA, July 15, 1867."

"I have this day taken from U. C. Coolgrove, Esq., one hundred and twenty-eight Brazoria county bonds of $100 each, and seventy-five coupons, detached from Brazoria county bonds. Said coupons are for $8 each. Said bonds and coupons have been paid to me to liquidate a note of hand drawn by U. C. Coolgrove in favor of the undersigned for $812.55, dated August 20, 1866, and due one day after date, and drawing ten per cent. interest from date. Also to secure me, the undersigned, for a note of $597, favor of J. W. Brooks, receiver, dated January 4, 1859, and due twelve months from date. Also to secure me, the said Underwood, against the payment of note signed jointly or as security in favor of the administrator of the estate of Clark, of Wharton county, for $5,000, given for negroes purchased by said Coolgrove from said Clark's estate, and for all of these and all other liabilities said Underwood is or may hereafter be under for said U. C. Coolgrove, said U. C. Coolgrove has transferred to said Underwood said bonds, and said Underwood, in case he has said liabilities forced upon him to pay, is to make use of said bonds to best advantage, accounting to said Coolgrove for what he realizes therefor; but said Coolgrove has the right to reclaim all the said bonds, etc., on the liquidation in full or the discharge of said Underwood from the above described liabilities, but said Underwood is to exercise full rights and ownership and to dispose of said bonds to best advantage to liquidate all or any of said liabilities in case the said payments are legally enforced and not longer subject to delay, being a sufficient reason for the disposition or sale of said bonds.

(Signed)                    "A. UNDERWOOD.

"COLUMBIA, July 15, 1867."

W. L. Davidson, among other things, testified: That shortly after the return of Mitchell and Coolgrove to Richmond there was full discussion of the bond matter, and it was agreed by all the parties that he (witness) should go immediately to Columbia and compro-

mise and settle the bond matter with Underwood. This occurred in the office of Mitchell, Calder & Davidson, in Richmond, Coolgrove concurring. He (witness) got the papers from him; don't recollect the limit fixed for compromise, but knows he got more than the limit. Coolgrove expressed no dissatisfaction with the compromise, but got twenty-three bonds. Calder received the bonds and made the settlement with Coolgrove.

Other facts are referred to in the opinion, in which is set forth the charge objected to.

*Chas. Cleveland*, for appellant, cited in support of the fourth charge asked by him, Hunter *v.* Hubbard, 26 Tex., 547; Winburn *v.* Cochran, 9 Tex., 123; Tinnen *v.* Mebane, 10 Tex., 253; Robertson *v.* Wood, 15 Tex., 1; 45 Tex., 311.

*Asa E. Stratton, Jr.*, and *Duff & Wilson*, for appellees, cited Tinnen *v.* Mebane, 10 Tex., 247; Grumbles *v.* Grumbles, 17 Tex., 477; Cochrane *v.* Winburne, 13 Tex., 150; 3 Tex., 128, 133; Perry on Trusts, pp. 863, 864; Wright *v.* Donnell, 34 Tex., 305; Baker *v.* Clepper, 26 Tex., 632; Carter *v.* Carter, 5 Tex., 102, and cases cited; Briscoe *v.* Bronaugh, 1 Tex., 340.

WEST, ASSOCIATE JUSTICE.— The ninth assignment of errors brings under review the action of the court in refusing the instruction asked by appellant on the question of limitation. The charge asked was as follows:

" If you believe, from the evidence, that Underwood held said bonds and converted them to his own use in 1867, and that said Underwood used no fraudulent means to conceal said conversion, and that said plaintiff might — by use of ordinary diligence — have discovered such conversion, then limitation begins to run against plaintiff as soon as she, by the use of ordinary diligence, might have discovered such conversion, and is limited to two years in which to bring her suit for the recovery of said bonds."

The appellant had in his pleadings set up the defense of limitation. The court declined to give this instruction, and in effect refused to submit an issue on this plea in any form to the jury.

It is suggested that the court refused the instruction because there was no evidence whatever introduced by appellant in support of this issue. It is true that the evidence on this point was not as full or pointed as it might have been made; still it cannot be fairly said

that there was no evidence at all bearing on the question or tending to prove the truth of the plea.

There was proof offered to the effect that, prior to 1877 (how long before it is not stated), appellee and her father had retained counsel to recover these bonds or their value from the appellant. It was also in evidence that this action of appellees in retaining counsel to bring suit was caused by the hostile attitude assumed by appellant, previous to that date, in relation to these bonds; there having been, before that time, correspondence between the appellant and the father of the appellee on the subject, from which Coolgrove had already learned that appellant would hold the bonds if he could.

There was also other testimony in the record tending to show that before July, 1867, the appellant was very much embarrassed and pressed by his creditors. There was also evidence tending to show that after July, 1867, and in August of the same year, the appellant was still badly involved, and unable to pay his debts; that about that time suits had been instituted against him on the Coolgrove liabilities enumerated in the receipt, and that as the upshot of the matter, appellant went into bankruptcy and was discharged. That about one year before appellant went into bankruptcy he transferred the bonds in question, together with Coolgrove's note, to Mrs. Borden.

The evidence thus discloses that in the summer or fall of 1867, appellant was sued and pressed by the creditors of Coolgrove, and as a result of that pressure, together with the pressure of his other creditors, he was compelled to go into bankruptcy.

From all these facts, the jury might have been authorized to infer that the transfer to Mrs. Borden, and the bankruptcy of the appellant, occurred as early as the latter part of the year 1867 or 1868. The evidence on this point, it is true, was not very strong, but it did have a tendency to show the fact that the transfer occurred about that date, or at least that it occurred prior to the year 1877.

The testimony, in itself, is of course not convincing either as to the date of the transfer by appellant or the date of his bankruptcy.

The evidence, too, disclosed enough to show that appellant had in his possession or controlled the evidence of the actual date of the transfer, and the date of his adjudication and the date of his discharge as a bankrupt. He also, it is plain, knew the exact date of Mrs. Borden's death, for he was her executor, and his wife was her sole heir.

· The marked failure, under such circumstances, of appellant to prove the actual date of the transfer to Mrs. Borden; his failure to show

when he was adjudged a bankrupt or when he was discharged; the absence of all attempt on his part to prove a fact so important in the case as the exact date of Mrs. Borden's death,— all these significant facts point strongly to the conclusion that this evidence, if produced, would have told against the appellant's plea.

The withholding of documentary evidence or papers in his possession that would throw light on the question, without any explanation being given as to why they are not produced, is well calculated to create the belief that, if produced, they would not aid the case of the party withholding them.   Johannes v. Bennett, 5 Allen, (Mass.), 169; Bayley v. McMickle, 9 Cal., 450; Tobin v. Shaw, 45 Me., 331; Blade v. Noland, 12 Wend. (N. Y.), 173.

It is possible, too, that the jury, had the issue been submitted to them, might have found that the appellant had, upon a view of the whole case, failed to sustain his plea of limitation.   Still it certainly cannot be said that there was no evidence whatever before the jury tending to establish the truth of this plea.   On the contrary there was undoubtedly evidence on that point, and enough, had the jury deemed it trustworthy, to have authorized a verdict for appellant upon that issue, had the matter been submitted to them.

The court, however, when it refused to instruct the jury at all on this point, and withdrew from their consideration the issue, practically decided, to all intents and purposes, that there was no evidence at all on this point.

It may be added, also, in the same connection on this point, that there was also evidence introduced going to show that from a date long anterior to 1867, and in fact down to the time of trial, appellee or her father, who seems to have had, for all practical purposes, the control of these bonds, if, in fact, he was not the true owner, resided near appellant.   His residence from 1860 to the time of trial appears to have been either in Brazoria, Wharton or Colorado counties.   There is no evidence that appellant ever deceived him at any time as to the relation in which he stood to the bonds.   Doubtless, if he had made inquiry, as it was his duty to do, in 1867, or from that date down to 1874, or at any time prior to 1877, he could have learned the relation in which appellant and Mrs. Borden's estate stood to these bonds.

There was not even a replication of fraud or concealment made in response to the plea of limitation.   Upon the whole, under the pleadings and evidence, we think the court committed an error, prejudicial to the rights of appellant, in refusing to give the instructions asked on the issue of limitation.   Or, at least, in not submitting

in some form this issue to the jury, to be passed on by them under a proper charge.

Complaint is also made of the action of the court in giving the third instruction asked by appellee. That charge was as follows:

"The authority of an attorney-at-law, under his ordinary employment to bring and prosecute or to defend a suit, does not authorize him, unless so specially, to compromise the business placed in his hands, and defendants are required to show affirmatively that W. L. Davidson was authorized, aside from any employment as an attorney-at-law, to make the compromise alleged in defendants' amended answer, and defendants must bring home to plaintiff action or acquiescence in giving such authority to said W. L. Davidson, or else plaintiff is not estopped by said alleged compromise. When an agent exceeds the authority given him by his principal, his acts are not binding upon the principal; therefore, if W. L. Davidson was not specially authorized to make the alleged compromise, or if plaintiff has not accepted and ratified such compromise, it is not binding upon her."

It is insisted that, under the facts of the case, this charge gives undue prominence to the individual acts of W. L. Davidson. In other words, that it, in great measure, restricted the jury to the inquiry as to the personal authority of Davidson in the matter, apart from any employment or authority of his as an attorney-at-law, that he might have had, either expressly or by implication, existing in the law firm of which he was a member, and for whom he acted.

While considered in connection with the main charge of the court, it cannot be said that it was, upon a view of the whole case, undoubtedly error in the court to give this charge and to refuse the one asked by appellant on the same subject, yet we are inclined to think, when considered in reference to the evidence of Davidson, from which it was plain that he had not met the appellee, and had no direct instructions to himself individually from her father or from her to make the compromise, that it was perhaps calculated under the circumstances to mislead the jury.

The fourth assignment of errors, which brings in question the correctness of the ruling of the court in excluding evidence as to the value of the bonds sued on from 1860 to 1878, cannot be revised, as the bills of exception fail to disclose the objection which was raised to the evidence. The appellant has not, in his capacity as executor of Mrs. Borden, appealed, and hence the adverse action of the court on his plea of intervention in that capacity will not be considered.

On another trial, no doubt, the court will permit the petition of intervention to be filed, if leave is asked in time, and under circumstances not calculated to surprise the other party or delay the trial of the cause.

For the errors above indicated, the judgment of the court is reversed and the cause remanded.

REVERSED AND REMANDED.

[Opinion delivered March 20, 1883.]

Chief Justice WILLIE did not sit in this case.